Okay, this is the state of Illinois versus William Pascal, 1-17-0384. You have before you the 1st District, 2nd Division of the Appellate Court, which is Aurelia Puczynski, Terry Lavin, and Judge Smith. The order we'll follow is the appellant will present their case first and then without interruptions, and then the justices will ask their questions. Then the appellee will have their opportunity to present their case, and then we'll ask questions, and then we'll have the May it please the court. Counsel? My name is Roxanna Mason. I'm from the Office of the State Appellate Defender, and I represent Mr. Pascal. Mr. Pascal's case presents three important and distinct issues, but they share two things in common. First, they all demonstrate procedural unfairness that underlies Mr. Pascal's conviction. And second, they all require that this court vacate his convictions and remand for a new trial. Now, my intention today is to address the three issues in the same issue that are the same order they appear in the briefs and hit on some of the highlights and then answer any questions the court may have. Now, the first issue deals with the suggestive show-up procedure in this case, and it was a suggestive show-up procedure. Now, the test for whether an identification procedure and the is a two-part test, but the first part deals with whether it was actually an unduly suggestive procedure, and that burden is on the defendant. Here, Mr. Pascal has more than met that burden. Now, in the briefs, we addressed a variety of factors that demonstrate that this was a suggestive identification, but today I'd like to touch on two of them, the first being that it was simply unnecessary to do a show-up in this case, and what proves more than anything that it was unnecessary is the police conduct in this case. The first two people who were picked up as suspects, the ones who fled from the van, were actually taken directly to the police station to conduct a lineup, not a show-up. If a lineup and all of the procedural safeguards that come with it could be done for them, there was no reason not to do one for Mr. Pascal and the other two gentlemen in the van. Now, the other piece of evidence that really makes this a suggestive show-up is the group dynamic that came into play here. We have four eyewitnesses to this crime, four victims to this crime, and they were victims of a crime, there is no doubt, but instead of taking these four, well, three women and one girl, and giving them each an apprehended by the police, were in fact the men who had committed this crime, instead what happened is they were all put in the same car and then given a free-for-all to all sort of, as a group, identify whether these were the guys or not, and these weren't just for relative strangers, it was four people who had an established family relationship with established family dynamics that affected one another's ultimate identifications. That is unduly suggestive, and that means that the burden falls on the state to prove that, despite these suggestive procedures, Mr. Pascal was properly identified based solely on the witnesses' memories. Now, in briefs we discussed the five-factor test that the courts have looked at, but I think the most important thing to remember is those five factors are not exclusive. This court has to look at the totality of the circumstances, so not just the five factors in the cases, but also the actual facts of this case and how suggestive these procedures were in this unique case, and in light of the procedures employed, I do not believe the state can meet its burden, and therefore a new trial is required. Now, the issue in this case also deals with the identifications, and it deals with one particular state's witness, Doreese Lake, making the choice to violate a court order despite having been warned by the prosecution, and tell the jurors repeatedly that all four of the victims in this case had identified Mr. Pascal. It's problematic for two reasons. First, it's a confrontation clause violation. The two of the witnesses who testified at the suppression hearing and were victims of the crime did not testify at trial, so any identifications that they did make were not subjected to the crucible of cross-examination, but the second reason that it's a problem is that at least one of these witnesses may not have actually identified Mr. Pascal. At the motion suppress hearing, the witness, Ms. Pasco, testified that she had really seen two of the men, the two men who were in the kitchen with her while she was laying on the floor, and she identified those two men, one of them being a thin man, and one of them being a man with a fade haircut, a very short hairstyle. Now, at the time of these offenses, Mr. Pascal was by everyone's agreement anything but thin. He was well over 200 pounds, and he had shin-length braids, so he was not either of the men that that particular witness had the opportunity to see. Now, the person who was involved in the crime who was later identified as Mr. Pascal was in a completely different room with the other two witnesses, so it's not all that detrimental. It's not expected that she would have been able to identify Mr. Pascal, but the problem is Ms. Lake told the jury that she had, and in this closely balanced case where it was essentially the eyewitness's word against Mr. Pascal's word, that matters. Now, the final issue in this case deals with Mr. Pascal's defense and his statement that he did not commit this crime, and he tried to put on a defense that there was a legitimate reason why he was in the van with the men who actually had committed this crime, and the reason for that was because he was involved with an investigation for the FBI, and he was investigating a particular gun seller, and that gun seller had told him to get into that van, so he needed to do that so that he could fulfill his obligations to the FBI, but unfortunately the trial judge, due to a mistaken ruling on hearsay, did not allow Mr. Pascal to testify to that, so the jury was left with the story from Mr. Pascal that he had gone to this chicken and fish restaurant, he had met, or he had been dropped off there by the gun seller, and then these men in a white van who he didn't even know pulled up, and he just hopped in with them despite not having even gotten his food. That doesn't sound particularly credible or plausible, but when you add the fact that it was the gun seller who told him on that phone call to get into that van, suddenly it makes a lot more sense, and it fits in with the other evidence that came in at trial, and becomes a true credibility contest that the jury could have gone either way on. So for all of these reasons, there was an ongoing practice of procedural unfairness in Mr. Pascal's case, and procedural unfairness requires a new trial, so we ask that this court vacate his convictions and remand for a new trial. Any questions? Sure, let me start out, let's talk about show-ups. So what is the whole purpose behind the admissibility of a show-up identification? Show-ups are admissible in very limited circumstances. It's basically, you know, where the police have no option but to do a show-up, and you know, failing to do one at that time might result in the real perpetrators escaping. Yeah, so I mean, generally speaking, it's when the police are in hot pursuit of the suspects, right? Generally, yes. Okay, and you said that the show-up was suggestive, but how could that be true if one of the victims, Shakira, didn't even identify the defendant? How suggestive is that? Well, actually, Shakira's testimony is evidence that it was suggestive, because when Shakira testified at the suppression hearing, she identified Mr. Pascal. Now, once she was cross-examined on that identification, it came out that she'd only seen two men, she'd only identified two men at the same, but the issue with the... so eventually, her having heard the other identifications from her family members did affect her eventual testimony, but even at the time of the show-up itself, even if she only made two identifications of the two men that were in the room with her, that doesn't really indicate either way whether it was a suggestive show-up, because she had only ever seen two men. There would have been no reason for her to identify a third. Okay, last question on this point. Even if we suggest for argument that the show-up was suggestive, doesn't the evidence here meet the criteria under Biggers? Absolutely not. Why? A host of reasons. I mean, there are certainly a couple of factors where it does go in the state's favor under the Biggers test. The witnesses were, in fact, certain in their beliefs. This court has recognized in the past that the certainty element, really, the science doesn't support that one anymore. It's still in the Supreme Court test. We still consider it, but it's the least important of the factors. The other factor that's in the state's favor is, yes, this was a relatively quick identification, but the other three factors all go in Mr. This was an incredibly stressful situation where all of the witnesses were taken by surprise. This wasn't an expected event. They were told immediately to get down on the ground. They were on their bellies, on the ground, sort of looking up at the men who had committed this crime. And then the very limited descriptions that were given after the offense didn't even include a was eventually identified as Mr. Paschal incorrectly. The person who made the 911 call and gave those descriptions is the person who didn't even really see the third offender. So, we don't have any sort of matching description at the time. But the descriptions that we do have are important. For example, the description from Antoinette Lake that was given first at the suppression hearing and then given later at trial. At the suppression hearing, she describes the man who was in the bedroom with her as having certain facial hair and as having shoulder length braids or dreads. Now, among the five men who were ultimately arrested in this case, or at least taken to the police station and subjected to lineups or eventual arrest, Mr. Paschal was not the only one who met that description. And it was only at trial that her description changed and fit Mr. Paschal better. It was then suddenly she could remember years later that, oh no, it was definitely braids. And at that point, they were only neck length, not shoulder length. So, her description after she had seen him and after she'd been subjected to these suggestive procedures eventually evolved. But the earlier descriptions don't match. And it's also, you know, as I was addressing earlier, it's not just the bigger factors. It's also the totality of the circumstances. So, even if bigger factors do fall in the state's favor in this case, if those bigger factors only come into play, if the witnesses are only certain because they were subjected to an obviously suggestive procedure, then they don't really establish that this was a product purely of the witnesses' memories. Moving on to your second issue, tell me why you believe we should find that the evidence in this case was closely balanced. It's a straight up credibility contest. There are only two pieces of evidence that the state presented that Mr. Paschal was involved in this crime at all. I mean, women were certainly victims of a crime. That's overwhelming. But that he was involved in it, it's really just the identifications of the two witnesses who testified at trial and his mere presence in the van, which is addressed by the third issue. He had a reason that he proffered for being in the van. So, it came down to whether the jurors believed him or believed the testifying witnesses. So, since it's a credibility contest, that's the very a closely balanced test. Okay, that's all the questions I have. Polly, you may, John, you may proceed. Thank you, your honors. Again, may it please the court, my name is John Nowak. I'm an assistant state's attorney representing the people of the state of Illinois in this case. Your honors, this defendant received a fair trial. As for the defendant, the show up was proper. Defendant failed to meet his burden of showing that it was unnecessarily suggested. This was a quintessential show up and properly done and justified. It was necessary for the police to know whether they needed to continue to pursue the actual offenders in this case or whether they had apprehended the right crew. Defendant reads up, brings up the part that two victims who, or two defendants or two, offenders who fled were not included in that show up, but that's because they fled during the chase. They weren't there in the van when the van was eventually stopped. So, rather than have two show ups, which defendant would have certainly argued might have been even more suggestive, they had one show up once that van was stopped with the three who were still in the van. Again, this was a necessary one, hot pursuit, and again, just 30 minutes after this home invasion occurred. The police knew that the offenders fled in a white van. The police saw that white van fleeing the scene. They pursued it and they stopped it. In about 30 minutes after these crimes occurred, the four victims came to the scene of the show up and the police shined a light on each one of those men who were in the van. They shined it that the offenders were in her home for 10 minutes. And in her words, she used the word instantly. She recognized defendant instantly. And likewise with Antoinette, she said she was 100% sure that defendant was the one who was one of the offenders. She had the opportunity to view, to observe defendant for five to 10 minutes in her home. The lights were on and she could see it quite well. There's no evidence that the police influenced these identifications. They knew as soon as they saw him, they were unequivocal, clear, 100% certain, instantly recognized him right away. Defendant was one of the offenders. It was defendant's burden to show that this is a show up was unnecessarily suggestive. And he failed to meet this was what show ups are for 30 minutes after the offense. That's where this court's analysis could end. But for the sake of argument, as to whether the identifications were still reliable, if it was unnecessarily suggestive, these identifications weren't certainly reliable under the biggest factors. For instance, Darice and Antoinette had a great opportunity to view the offender during this crime. There was nothing blocking defendant's face during this home invasion. They saw his face for several minutes and the lighting inside was good. They also had a high degree of attention. Again, defendant was inside their home for this armed robbery and home invasion for five to 10 minutes. Antoinette even exchanged words with the defendant. And Darice said she was focused on defendant's face because she feared the defendant was going to shoot and kill Antoinette. So they had a high degree of attention. Likewise, at the show up, each of these women were highly certain of their identification of defendant. They never hesitated. They never equivocated. Darice recognized defendant instantly and Antoinette said she was 100% sure. And the time between the offense and the initial identification could hardly have been shorter. We're not talking hours or days, talking 20 to 30 minutes, right after the offense. This was fresh in their minds. They identified defendant instantly or were 100% sure. So even if it could be argued that this was unnecessarily suggestive, these identifications were still reliable. This court should affirm. As for the second issue, defendant received a fair trial despite a few fleeting references by a witness to others identifying the defendant. Trial court did not abuse its discretion in denying that motion. There was no ineffective assistance of counsel for not moving to strike. Darice gave detailed testimony of the course of what amounted to more than 75 pages in a transcript. And just three times in quick succession during cross-examination is when she referred to all of them identifying defendant. This was in response to questions on cross about whether all four of the victims viewed the suspects together. Now the trial court was right in the sidebar when she explained that Darice simply got a little excited when she was being cross-examined about all four victims viewing the suspects at the same time. Defense counsel in oral argument says that this was a choice by Darice. It was not a choice. The trial court was in the courtroom. She saw Darice testifying. She described it as Darice simply getting a little excited. This wasn't a choice by Darice. She was just under pressure, testifying, got a little excited, and was asked about whether all four victims viewed the defendant. And she made these few fleeting references to them all identifying him. But this was never brazed again in front of a jury. The people didn't follow up on it and redirect. It was never argued during closing arguments. That was it throughout this whole trial. And these fleeting references, your honors, was certainly harmless beyond a reasonable doubt. There was no prejudice here. There was overwhelming evidence of defendant's guilt. Darice and Antoinette testified credibly and in detail about defendant being one of the men that invaded their home and robbed them. They identified defendant at that show up and in court. And those identifications at the show up were corroborated by Sgt. Smith. And Sgt. Smith and Officer Lewis both observed that white van fleeing the scene. And then the prosecutors again never followed up with Darice about this on direct and never mentioned it in closing. There was overwhelming evidence that this defendant was part of this home invasion and armed robbery. They identified him at the scene. They instantly recognized him. Were 100% sure just half an hour after the offenses. This also wasn't closely balanced. This was not a choice as in SEBI between two equally plausible accounts. That's how the Illinois Supreme Court put it in SEBI. It was a closely balanced case in SEBI because it was two equally plausible accounts. Here we have one plausible account. That is the detailed overwhelming testimony by Darice and Antoinette. And then an implausible account by defendant about his work for the FBI. And he just happened to be at a restaurant near the scene of the home invasion. And then the white van comes. These are not credible equally plausible accounts. This was not closely balanced. Defendant received a fair trial. And this court should affirm on that basis. And that flows right into the third and final issue about defendant's account of this. And again, why it is not equally plausible. Defendant testified extensively about his FBI work and his convoluted explanation for his presence in that white van that was fleeing that home invasion. The trial court did not abuse its discretion and prohibiting hearsay testimony about what specifically pistol Pete of telling him to get in that van. The trial court allowed defendant to present a complete defense. Defendant testified extensively about his work as an informant for the FBI and Chicago Police Department. Defendant testified about following a lead to purchase guns from pistol Pete. Defendant testified about how after he talked to pistol Pete, a white van pulled up. The back door slid open and one of the people waved him into the back of the defense counsel in closing argument used defendants testimony and this implausible account to explain that the only reason he was at that restaurant where this near where the home invasion occurred was because of his cooperation with the FBI and the CPD. And that's why he got in that van to go home. Not allowing hearsay testimony specifically about what Pete told him to get in everything else came in. It was certainly the jury heard everything defendant had to say about this and his defense and his account about this. The trial court simply did not abuse of discretion to abuse its discretion and prohibiting this testimony which is the standard here an abuse of discretion. Defendant received a fair trial here and for these reasons those are brief we ask that this court affirm defendants convictions for home invasion and armed robbery. Now of course I'm happy to answer any questions this court may have. All right any questions? I just have questions about the issue number two the motion to eliminate Doresa's testimony confrontation clause. Do you concede that the motion eliminated was violated? She did it you know on her own not not by the state? It it was as it was argued at trial was that and this is how the trial court viewed it was that it was not a deliberate violation of it. It it wasn't a choice and that's why the trial court explained that this was just the witness getting a bit excited about it. And so there really was there was no violation of the motion eliminate here which is what the court held. And then on page 20 of your brief you reference plain error saying that was not preserved. So is it plain error was it harmless error beyond a reasonable doubt which isn't or can you yeah you're trying to have it both ways? Trying to cover all our bases your honor. With the with with plain error and we're trying just to cover to cover both arguments there. I'm not sure how else to put it with that because whether it's either under being it's not closely balanced and whether it's harmless beyond a reasonable doubt even under the harmless beyond a reasonable doubt standard it certainly was that. Thank you that's all I have. All right Roxanne you may proceed. All right may it please the court. I would just like to briefly address something that counsel just spoke about regarding the plausibility of Mr. Key in this case is that his defense was plausible. Now the state spoke about how the police in this case in the hot pursuit they had seen this white van that they had heard the perpetrators were in speeding away from the scene and they saw that when the police arrived on scene. Now Ms. Antoinette Lake testified that they did not call 9-1-1 immediately instead when the perpetrators of this offense left they all laid on the ground for at least a minute before she got up went and checked to make sure that the men had really left and then she went around and checked on her three family members and then after a few minutes had gone by they exited the building while her young cousin called 9-1-1. Then two to three minutes later the police arrived on scene some minutes ticked by and that's when the police officer seized the white van. Now what did Mr. Paschal testify to that when the white van came back and he got in that they were supposed to get on the interstate but instead the guy who was driving didn't know what he was doing and wound up looping around the neighborhood going north and then looping around which would then put that white van back at the scene of the crime for the police officers to see it minutes after the alleged offense. If Mr. Paschal had been at the van at the house then that would mean that after the offense occurred the perpetrators all went sat in the van in the alley for five or six minutes and waited for the police to show up to start a chase. So it's Mr. Paschal's story that's actually more credible in light of the other evidence. Now one other thing that council brought up with relation to the the white van is that you know this was a hot pursuit and this is the perfect case for these sorts of show-ups because this was a hot pursuit and you know but we needed to make sure that the real perpetrators didn't get away but it seems like the state's trying to have it both ways. They say that they know that these were the guys because they knew that it was the white van and they were able to follow it right there from the scene of the crime but if they knew that and they knew this white van was involved then there's not really any concern that these real perpetrators are out there getting away. They know that it was somebody who was in the van so there's no reason to do a show-up. They could have taken everyone to the station to do a lineup and to have those procedural protections. So for these reasons we believe that Mr. Paschal should receive a new trial. Thank you. Any questions? No. All right thank you both for your time. Your briefs were very well done and you both argued rather interestingly so thank you and we'll let you know within the next two weeks the outcome.